**LAIDLAW TRANSIT, INC., Appellant,**

v.

**ANCHORAGE SCHOOL DISTRICT and First Student, Inc., Appellees.**

No. S–10796.

Supreme Court of Alaska.

Aug. 12, 2005.

Sean Halloran, Hartig Rhodes Hoge & Lekisch P.C., Anchorage, for Appellant.

Andrena L. Stone and Saul R. Friedman, Jermain Dunnagan & Owens, P.C., Anchorage, for Appellee Anchorage School District.

Stephen H. Hutchings and Tina M. Grovier, Birch, Horton, Bittner and Cherot, Anchorage, for Appellee First Student, Inc.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I. INTRODUCTION

Laidlaw Transit and First Student both bid on the Anchorage School District's pupil transportation contract for 2001–2006. The district deemed both bids responsive and awarded the contract to First Student, finding the award to be in the district's best interests. Laidlaw sued the district and First Student, seeking to overturn the award, alleging fraud, miscalculation of the value of its proposal, violation of its right to procedural due process, and other errors. The superior court converted the suit to an administrative appeal, declined to hold an evidentiary hearing, and affirmed the board's decision. Laidlaw appeals, claiming that the superior court erred in treating its suit as an administrative appeal, in denying a trial de novo, and in affirming the contract

award to First Student. We affirm the award, concluding that (1) Laidlaw's superior court action was properly treated as an administrative appeal, (2) its claims of fraud and miscalculation were barred by its failure to exhaust available administrative remedies, (3) a trial de novo was unnecessary because the school district's proceedings complied with due process, and (4) the district's bid-responsiveness determinations and best-interests findings comply with applicable law and are rationally grounded.

## II. FACTS AND PROCEEDINGS

The background facts of the case are largely undisputed. Anchorage School District began soliciting bids for a new pupil transportation contract in October 2000. Laidlaw Transit, Inc., held the then-existing contract, which was to expire June 30, 2001, and had provided some or all of the district's pupil transportation for the previous twenty years. The district and the Alaska Department of Education were concerned about lack of competition for pupil transportation contracts, so the district coordinated with the Fairbanks and Matanuska–Susitna Borough school districts to issue Requests for Proposals at the same time, hoping to attract more proposers. In response to its Request for Proposals (RFP), the district received five bids, including bids from Laidlaw and First Student, Inc.

The district certified all the proposals as responsive to the RFP. Laidlaw submitted the low bid, offering a total daily rate of $50,465.42. First Student's proposal fell within five percent of Laidlaw's. The Department of Education's regulations allowed the district to select a proposal other than the low proposal if the other proposal fell within five percent of the low proposal, the proposer offered to match the low proposal, and the district found that awarding the contract to that proposer would be in the district's best interest.[1] First Student offered to match Laidlaw's proposal.

The district's staff recommended that the school board award the contract to First Student. At its meeting on January 22, 2001, the Anchorage School Board considered the proposals from Laidlaw and First Student.

District staff spoke in support of its recommendation of First Student. Executives from First Student spoke in support of their proposal. Laidlaw executives and a Laidlaw driver spoke in support of Laidlaw's proposal. The board asked questions of several of the speakers. At the close of the meeting, the board voted to award the contract to First Student.

After reviewing First Student's proposal and supporting documents, Laidlaw notified the school board that it had elected not to file a petition for reconsideration. Instead, the company filed an original civil action in superior court challenging the district's determinations that First Student's proposal was responsive to the RFP and was in the district's best interests. Laidlaw's complaint further alleged fraud by district staff and First Student, defamation and slander by First Student, and breach of contract by the district. Laidlaw asked the court to enjoin or invalidate the district's contract with First Student, to award the contract to Laidlaw, and, in addition, to award Laidlaw bid preparation costs, contract damages, and attorney's fees. Laidlaw also advanced independent claims for interference with economic advantage and restraint of trade.

On the motion of the district and First Student, and over Laidlaw's opposition, the superior court converted the case into an administrative appeal, treating it as a matter calling for review of the district's responsiveness and best-interest determinations, based on the agency record. The court called for the parties to brief these issues and stayed Laidlaw's separate claims pending resolution of the appeal.

The superior court affirmed the district's decision and awarded attorney's fees to the district and First Student. Laidlaw appeals.

## III. DISCUSSION

### A. Conversion to Administrative Appeal/Denial of Trial DeNovo

Asserting that the school board's decision did not amount to an agency proceeding and that, even if it did, it failed to comport with the requirements of due process, Laidlaw

---

1. *See* 4 Alaska Administrative Code (AAC) 27.085(f)(1)(B) (repealed 6/4/2004, Reg. 170).

initially argues that the superior court erred in converting the case to an administrative appeal and/or in denying Laidlaw a trial de novo.

Whether Laidlaw's superior court action qualifies as a case reviewable in superior court as an appeal is a question of law that we decide independently.[2] Questions of constitutional compliance are also subject to independent review.[3]

### 1. Conversion to administrative appeal

Laidlaw notes that an agency's action is subject to review in the superior court if it is an "adjudicative proceeding."[4] Citing *Hickel v. Halford*,[5] it contends that the district did not conduct an adjudicative proceeding, so the action Laidlaw filed in superior court should not have been converted to an administrative appeal.

In *Hickel*, we cited three common attributes of administrative proceedings:

1. A dispute must exist.

2. A document reflecting the fact of the dispute which serves a function similar to that of a complaint in a civil action, or an accusation or statement of issues under the Administrative Procedure Act, AS 44.62.360, 370, must be served by one party on the other party.

3. The document must set in motion mechanisms prescribed by statute or regulation under which the dispute will ultimately be resolved.[6]

Laidlaw asserts without explanation that the district's actions fail each of these standards.

But the accuracy of this assertion is debatable. In *Hickel*, we cited the Black's Law Dictionary definition of "dispute," which reads, in part: "a conflict or controversy; a conflict of claims or rights; an assertion of a right, claim, or demand on one side, met by contrary claims or allegations on the other."[7] Here, the district's staff decided to recommend that the board award the contract to First Student. Because Laidlaw sought the award itself, a dispute existed; the first *Hickel* factor was thus met. The second factor—a formal, complaint-like document reflecting the conflict—might be viewed as having been met when the district faxed Laidlaw its formal notice of intent to award the contract to First Student. And finally, this notice arguably triggered a formal mechanism for resolving the dispute prescribed by the controlling regulation then in effect, 4 AAC 27.085.[8] This provision required the board to determine if awarding the contract to First Student instead of Laidlaw was in the district's best interest; it further granted Laidlaw the right to seek reconsideration in the event of an adverse decision.[9]

In other cases, we have also noted that an administrative action is adjudicatory when it relates to an individual and results in a record capable of appellate review.[10] Here, the board based its approval of the district's intent to award the contract to First Student instead of Laidlaw on an extensive documentary record submitted by First Student, Laidlaw, and the district's staff; and the board's hearing on the issue was recorded and transcribed, thus generating a record

---

2. *See Brandon v. State, Dep't of Corr.*, 938 P.2d 1029, 1031–32 (Alaska 1997) (exercising independent judgment to determine whether prisoner classification hearing is an adjudicative proceeding).

3. *Id.* at 1031.

4. *See, e.g., Kilmer v. Dillingham City Sch. Dist.*, 932 P.2d 757, 762 (Alaska 1997).

5. 872 P.2d 171 (Alaska 1994).

6. *Id.* at 175.

7. *Id.* at 178 n. 11 (quoting Black's Law Dictionary 472 (6th ed.1990)).

8. 4 AAC 27.085, the regulation governing pupil transportation contracts in effect at the time that the district awarded First Student the transportation contract, was repealed in 2004, apparently because of significant amendments in state law governing funding of transportation contracts. *See* AS 14.09.010, as amended by ch. 54 § 1, SLA 2003; Regulation repealed 6/4/2004, Reg. 170. As of the publication date of this opinion, it does not appear a replacement regulation has been adopted. Because this case is controlled by provisions of the repealed regulation, this opinion discusses that regulation as if it remained in effect.

9. *See* 4 AAC 27.085(f)(1) & (g) (repealed 6/4/2004, Reg. 170).

10. *See Brandon*, 938 P.2d at 1032–33.

capable of meaningful review on appeal. Under this view and the *Hickel* factors, the board's decision awarding the contract to First Student might be considered to be an administrative adjudication reviewable by the superior court under the formal standards governing administrative appeals.[11]

Alternatively, and perhaps more plausibly, the best-interest hearing before the board might be viewed as an executive or legislative action rather than an adjudicative determination. This view conforms to the structure and basic purpose of the board's best-interest determination. The relevant state regulation, 4 AAC 27.085, adopted an orderly and expeditious process for awarding transportation contracts through evaluation of written offers responding to an RFP. The process was essentially executive, not adjudicative: its basic goal was simply to select a winning offer of a contract, not to resolve disputes among competing holders of vested contract rights.

This alternative view of the best-interest determination as a non-adjudicative function also comports with the treatment commonly given to similar determinations in analogous administrative settings. A good illustration may be found in the state procurement code.[12] Under the code, purchase/award decisions are made by the procurement officer based on a "most advantageous" determination that is much like the school board's best-interest determination here.[13] Only after the procurement officer makes the most-advantageous determination does the administrative adjudication process begin: interested parties may protest the award; the procurement officer issues a written decision on the protest; and the aggrieved party may then appeal to the commissioner.[14] If genuine issues of fact are raised, either the commissioner or a hearing officer must decide them after holding a hearing.[15] The commissioner's decision may then be appealed to the superior court.[16]

The state regulations governing school bus contracts defined a similar adjudicative process in 4 AAC 27.085(g), which gave disappointed bidders the right to petition for reconsideration of the school board's best-interest determination. As we more fully explain below in discussing Laidlaw's due process claim, while subsection .085(g) limited the right of reconsideration to claims alleging fraud, duress, or calculational error, these limitations seem closely tailored to fit the limited scope of a disappointed bidder's interests in receiving a given award.

On balance, then, we agree with Laidlaw's assertion that the school board's best-interest hearing was not an adjudicative proceeding, and its best-interest finding does not constitute a formal adjudication. Yet it hardly follows that the board's best-interest determination is not subject to an administrative appeal. As mentioned above and more fully described below in our discussion of Laidlaw's due process claim, 4 AAC 27.085(g) established a formal adjudicative process for administrative review of the board's best-interest determination. More important, even in the absence of subsection .085(g), Laidlaw's superior court action challenging the board's best-interest determination would still properly be characterized as an administrative appeal.

Laidlaw starts from the mistaken premise that an agency's actions can give rise to an administrative appeal in the superior court only if the agency takes those actions in a formal administrative proceeding. But our cases uniformly point to the opposite conclusion. We have frequently emphasized that, "[h]owever denominated, a claim is functionally an administrative appeal if it requires the court to consider the propriety of an [administrative] determination."[17] To be sure, the technical requirements that formally govern administrative appeals attach only when cases arise from administrative adjudi-

---

11. *See* Alaska R.App. P. 602.

12. *See* AS 36.30.550–.699.

13. *See* AS 36.30.250.

14. *See* AS 36.30.560–.680.

15. *See* AS 36.30.670.

16. *See* AS 36.30.685.

17. *Haynes v. State, Commercial Fisheries Entry Comm'n*, 746 P.2d 892, 893 (Alaska 1987); *see also Kleven v. Yukon–Koyukuk Sch. Dist.*, 853 P.2d 518, 524 (Alaska 1993); *Owsichek v. State, Guide Licensing & Control Bd.*, 627 P.2d 616, 620 (Alaska 1981).

cations.[18] But we have nonetheless traditionally reviewed a wide variety of non-adjudicative administrative and executive actions under the same narrow and deferential standards that apply in administrative appeals.[19] In such cases, although the applicable procedures are sometimes improvised, the superior court typically bases its ruling on the administrative record; the court usually confines its consideration to asking whether the agency has taken a "hard look" at the disputed issue, whether it has decided the case on a rational basis; or whether its decision was arbitrary and capricious; and the court often issues its decision in the form of a declaratory or summary judgment.[20]

Here, Laidlaw's action requested the superior court to issue an order voiding First Student's contract and directing the district to award it to Laidlaw instead. The superior court could not have considered granting this relief unless it first determined that the district erred in its decision to award the contract to First Student. Even though the board entered its decision in a non-adjudicative proceeding, then, the superior court accurately characterized Laidlaw's action as a challenge to the board's decision, and on that basis properly converted it to an administrative appeal, rather than treating it as a fresh superior court action.

## 2. Denial of trial de novo

■ Laidlaw nonetheless contends that the superior court erred in failing to conduct a trial de novo because, in Laidlaw's view, the board's proceedings denied Laidlaw due process. As Laidlaw correctly notes, our case law indicates that when an administrative proceeding fails to conform to the minimum requirements of procedural due process, the superior court may not review the case on the agency record but must instead remand for a new agency hearing or grant a trial de novo as needed to cure the procedural defect.[21] But here, Laidlaw fails to convince us that any of the deficiencies it asserts amounted to a violation of its right to procedural due process.

### a. Due process rights of disappointed bidder

We reject at the outset Laidlaw's position that its status as a disappointed bidder entitled it to the entire panoply of formal procedural safeguards that attach when a proceeding concerns a vested property interest.[22] Laidlaw cites *Aloha Lumber Corporation v. University of Alaska*[23] for this proposition. But Laidlaw misreads that decision. In *Aloha Lumber*, we expressly assumed that a vested interest existed, merely holding that no due process violation had been shown in any event.[24] In sharp contrast to *Aloha Lumber's* arguendo assumption, we have generally recognized that "rights do not arise under a public contract until a bid is accepted." [25] In *King v. Alaska State Housing Authority*, for example, we specifically held that a responsive bidder on an RFP lacked any vested right to claim a preference if the winning bidder's contract was ultimately declared void.[26] And though we recognized that the state owed all bidders a fair and honest consideration of their proposals, we

18. *See* Alaska R.App. P. 602.

19. *See, e.g., Southeast Alaska Conservation Council, Inc. v. State*, 665 P.2d 544, 548 (Alaska 1983); *Moore v. State*, 553 P.2d 8, 31–33 (Alaska 1976).

20. *Southeast Alaska Conservation Council, Inc.*, 665 P.2d at 548–49.

21. *See Aloha Lumber Corp. v. Univ. of Alaska*, 994 P.2d 991, 998 n. 14 (Alaska 1999); *State v. Lundgren Pac. Constr. Co., Inc.*, 603 P.2d 889, 895 (Alaska 1979).

22. *See, e.g., Chijide v. Maniilaq Ass'n of Kotzebue, Alaska*, 972 P.2d 167, 171–72 (Alaska 1999) (referring to due process protections that apply "only when an individual has a life, liberty, or property interest to protect").

23. 994 P.2d 991.

24. *Id.* at 998–99.

25. *Earthmovers of Fairbanks, Inc. v. State, Dep't of Transp. & Pub. Facilities*, 765 P.2d 1360, 1364 (Alaska 1988) (citing *Beirne v. Alaska State Hous. Auth.*, 454 P.2d 262, 264 (Alaska 1969)).

26. 633 P.2d 256, 259–60 & 263 n. 8 (Alaska 1981); *cf. Associated Builders & Contractors, Inc. v. City of Seward*, 966 F.2d 492, 499 (9th Cir. 1992) ("wishful bidders ... have no constitutionally protected property interest in [a public contract]").

expressly ruled that, even if the state failed to meet this obligation, strong public interests precluded the disappointed bidder from claiming anything more than the reasonable costs incurred in preparing the unsuccessful bid.[27]

■ Laidlaw attempts to distinguish its situation by claiming that the district had no discretion not to award the contract to Laidlaw if First Student's bid proved fraudulent or non-responsive. In support of this claim, Laidlaw cites 4 AAC 27.085(f)(1), which stated that the district

shall offer the contract either (A) to the proposer whose responsive proposal contains the lowest dollar amount; or (B) to a proposer whose responsive proposal is within five percent of the responsive proposal with the lowest dollar amount if the proposer agrees to match the responsive proposal with the lowest dollar amount and the board determines that the offer to other than the low proposer is in the best interest of the district.[28]

Laidlaw argues that this language made it mandatory for the district to award it the contract, thus effectively giving Laidlaw, as the low bidder, a vested interest in the contract if the district erred awarding it to First Student.

But this argument fails, since 4 AAC 27.085(f)(2)—the paragraph of the regulation that immediately followed the one cited by Laidlaw—expressly empowered the district "to reject all responsive proposals if, in its judgment, the proposals are too costly."[29] Because paragraph (f)(2) granted comprehensive discretion not to award the contract to any bidder, paragraph (f)(1) cannot prop-

erly be read as having created a property interest.[30]

Under *King*, then, Laidlaw's position as a disappointed bidder and current incumbent gave it no special hold on the pupil transportation contract and no right to claim the full array of procedural protections surrounding vested property interests.

This is not to say that Laidlaw had no right at all to procedural due process. We have held that the Alaska Constitution's due process clause must be flexibly applied by balancing three factors:

the private interest affected by the official action; the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the fiscal and administrative burdens that additional or substitute procedural requirements would entail.[31]

In keeping with this flexible standard, we noted in *Frontier Saloon, Inc. v. Alcoholic Beverage Control Board* that "due process does not require a full-scale hearing in every situation to which due process applies."[32]

More specifically, regarding administrative matters, we observed in *Hickel v. Halford* that

minimal due process requirements do define necessary requirements of all adjudicatory proceedings. Without providing at least notice and the opportunity to participate to those who might be affected, no administrative action can either resolve the dispute to the satisfaction of all of the parties or be considered final despite later objections.[33]

---

**27.** *King*, 633 P.2d at 260.

**28.** 4 AAC 27.085(f)(1) (repealed 6/4/2004, Reg. 170).

**29.** 4 AAC 27.085(f)(2) (repealed 6/4/2004, Reg. 170).

**30.** Laidlaw further argues that it had a property interest in having $56,603 deducted from its bid. When Laidlaw and the district negotiated revisions to their existing contract in February 1999, Laidlaw offered to refund that amount to the district if Laidlaw were awarded the district's next transportation contract, "provided that this amount is considered in the bid evaluation as a reduction in our proposed costs under the con-

tract proposal for the 2001–2002 school year." But as the superior court essentially recognized in rejecting this argument below, Laidlaw's agreement vested it with a contractual right under its prior contract, and that right could have had no effect on Laidlaw's rights in relation to the district or the other bidders under the current RFP.

**31.** *Midgett v. Cook Inlet Pre–Trial Facility*, 53 P.3d 1105, 1111 (Alaska 2002) (adopting test articulated in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

**32.** 524 P.2d 657, 661 (Alaska 1974).

**33.** 872 P.2d at 179–80.

■ *Hickel* sets the baseline for the minimum procedural rights due in adjudicative proceedings. But as we have already determined above, the school bus award process was not an adjudicative proceeding. The detailed provisions of 4 AAC 27.085 defined limited procedural rights for disappointed bidders like Laidlaw. We must look to those sources for guidance in determining whether the district denied Laidlaw its due process rights. In interpreting 4 AAC 27.085, we must also be mindful of its structure and basic purpose.

■ As already noted, the regulation's provisions described an orderly and expeditious process for awarding transportation contracts through evaluation of written offers responding to an RFP. The regulation's basic goal was simply to select a winning offer of a contract, not to resolve disputes among competing holders of vested contract rights. And as a matter of public policy, the need for efficiency in government commands that the process be able to function quickly and dependably. Given its structure and purpose, then, we think that 4 AAC 27.085 permissibly defined a non-adversarial, document-based selection process in which the trappings of formal evidentiary hearings had minor significance.

### b. Due process requirement for school board best-interests hearing

■ With these principles in mind, we turn to Laidlaw's specific due process contentions. Laidlaw argues initially that because the district did not send out its memorandum recommending the award to First Student until after the close of business on the Friday before the board's Monday meeting, Laidlaw received insufficient notice of the issues needing to be addressed at the meeting. Laidlaw further asserts that the district intentionally delayed release of the information to Laidlaw.

The district acknowledges that its RFP expressly entitled all responsive bidders to receive notice of its recommendations "as far in advance" of the board hearing as possible.

But the record indicates that, as required, the district conscientiously did try to provide Laidlaw the earliest notice possible. On the morning of Friday, January 19, 2001, immediately after reaching its decision to recommend that the contract be awarded to First Student, the district informed Laidlaw by fax of its intent to present its recommendation at the board meeting, which had already been scheduled for the evening of Monday, January 22, 2001. The district finalized the memorandum supporting its recommendation, and faxed it to Laidlaw when it was completed at 6:04 p.m. on Friday, January 19. As the district and First Student point out, this notice enabled Laidlaw to appear at the Monday meeting and speak meaningfully in support of its own proposal.

Citing *Fairbanks North Star Borough Assessor's Office v. Golden Heart Utilities, Inc.,*[34] the district and First Student assert that Laidlaw had adequate notice under the requirements of due process. In *Golden Heart* we found that receipt of an agency's position memorandum on the Friday before a Monday board of assessment hearing gave the taxpayer, Golden Heart, adequate notice under due process.[35] Similarly, the RFP in this case required the district to provide notice of its intent to award the contract only "as far in advance" as possible. And here, as in *Golden Heart,* the record indicates that Laidlaw understood, and adequately addressed, the district's position at the hearing.[36]

Laidlaw's attorney wrote and delivered a letter to the school board members in advance of the meeting, addressing many of the issues raised in the district's memorandum: liquidated damages, labor relations, and First Student's ability to provide sufficient equipment. Laidlaw was able to fly at least two executives to Anchorage for the meeting, and it was able to notify several local employees who were present at the meeting. Seven speakers represented Laidlaw at the board meeting; they further addressed the concerns the district raised in its memorandum, such as communication difficulties, liquidated

**34.** 13 P.3d 263 (Alaska 2000).

**35.** *Id.* at 274.

**36.** *See id.*

damages, bus size, and drivers' attendance at training and safety meetings. We find no indication that Laidlaw was substantially hampered in preparing its presentation.

These circumstances are readily distinguishable from the ones that recently led us to find a due process violation in *State, Department of Natural Resources v. Greenpeace, Inc.*[37] There, Greenpeace had appealed DNR's decision to issue a water use permit to BP Exploration (Alaska) (BPXA); under applicable law, the appeal entitled Greenpeace to a mandatory stay of the permit. BPXA filed an expedited motion requesting DNR to lift the stay; it then left Greenpeace's attorney a telephone message informing him that an opposition was due the following day. The attorney was out of town and failed to receive the message until he returned several days later. By then, DNR had already lifted the stay.[38] In concluding that the one-day notice violated Greenpeace's right to due process, we emphasized the importance of the stay and its mandatory nature, the serious and irreparable harm potentially threatened by lifting the stay, the absence of any clear need for emergency action, and the fact that the truncated period for response completely deprived Greenpeace of an opportunity to respond before DNR acted on BPXA's motion and lifted the stay, which left Greenpeace with no adequate recourse.[39]

Here, by contrast, the school board's hearing was not a formal adjudicative proceeding, the fact that the board would be required to decide the best-interest issue was well understood, and the date of the school board meeting had been scheduled in advance. More important, the record establishes that the three-day notice actually given sufficed to enable Laidlaw to submit a cogent and well-prepared response to the district staff's recommendations. Additionally, the board's best-interest determination had no immediate or irreparable impact; to the contrary, 4 AAC 27.085(g) expressly entitled Laidlaw to petition for reconsideration and provided for an automatic stay of the award pending a ruling on the petition.

Moreover, the record fails to support Laidlaw's assertion that the district intentionally delayed releasing its intent-to-bid memorandum to Laidlaw. It shows that the district faxed the memorandum to all the proposers at approximately the same time on January 19. The record also indicates that as late as January 17, First Student continued to provide the district with supplemental information regarding its ability to provide the required buses and its position on labor unions. The affidavit of Steve Kalmes, the district's Director of Transportation, states that Superintendent of Schools Carol Comeau "did not make her determination regarding which company to recommend the award to until January 18, 2001." The record as a whole thus supports an inference that the district did not intentionally delay release of its bid recommendation to Laidlaw.

Considering the totality of these circumstances, we conclude that Laidlaw has failed to establish that the three-day notice at issue here violated its right to due process.

▮▮▮ Laidlaw alternatively contends that its due process rights were violated by the manner in which the board conducted its meeting. In asserting this contention, Laidlaw complains that the district failed to give Laidlaw a copy of First Student's proposal in advance of the meeting, that Laidlaw was not allowed to call or cross-examine witnesses, and that some of the speakers who favored Laidlaw were limited to three-minute presentations.

▮▮▮ But Laidlaw builds this claim on a premise that we have already rejected: its assumption that "the conduct of an adjudicatory hearing must be 'consistent with the essentials of a fair trial.' "[40] As we have indicated, the board's hearing was not an adjudicatory proceeding; and even if it had been, because the hearing was not meant to resolve competing property interests, due process would not have automatically entitled

**37.** 96 P.3d 1056 (Alaska 2004).

**38.** *Id.* at 1059.

**39.** *Id.* at 1065–66.

**40.** Laidlaw wrongly cites *Balough v. Fairbanks N. Star Borough,* 995 P.2d 245, 266 (Alaska 2000) for this proposition.

Laidlaw to the trappings of a formal trial. As First Student correctly observes, and as we have previously held, "due process does not require a full-scale hearing in every situation to which due process applies."[41] Here, while the board did not model its meeting on a trial, the procedures actually used provided Laidlaw with an adequate opportunity to argue its position. Although the district did not give Laidlaw a copy of First Student's proposal until after the board meeting, the district's memorandum gave Laidlaw ample notice of the arguments that the district intended to make in support of an award to First Student. Furthermore, the district's actions accorded with 4 AAC 27.085(i), which did not require the district to send non-winning bidders copies of its recommended proposal, but merely required it to make all proposals available for public inspection during business hours.[42] Notably, Laidlaw has not alleged that the district failed to make First Student's proposal available for inspection.

■ Although Laidlaw insists that the school board erred by denying cross-examination and limiting testimony, 4 AAC 27.085 did not require the board to grant cross-examination or to hear unlimited testimony in deciding whether the district's best interests would be served by awarding the contract to First Student; indeed, the regulation does not appear to have envisioned any for-

mal evidentiary presentation during a board hearing on the best-interest issue.[43]

Despite the absence of any provision requiring a trial-like hearing on the best-interest issue, the board in fact did allow two senior Laidlaw representatives unlimited time to speak, and permitted other witnesses to make three-minute presentations.[44] And Laidlaw fails to identify any specific prejudice resulting from the procedures used during the board's best-interests hearing. In short, we find no procedural deficiencies in the January board hearing that would have compelled the superior court to grant Laidlaw a trial de novo on appeal.

### c. Due process rights on reconsideration/exhaustion of administrative remedies

■ Since our conclusion above focuses mainly on Laidlaw's procedural rights at the January 22 hearing, it only resolves Laidlaw's procedural due process claim insofar as the claim relates to matters finally resolved at that hearing—primarily, whether the district's best interest would be served by awarding the pupil transportation contract to First Student. In ruling that Laidlaw received fair treatment at the hearing, then, we have not considered whether Laidlaw possessed, or might have been denied, additional procedural rights after the hearing concluded.

---

**41.** *Frontier Saloon, Inc.,* 524 P.2d at 661; *see also Stacy & Witbeck, Inc. v. City & County of San Francisco,* 36 Cal.App.4th 1074, 44 Cal. Rptr.2d 472, 479 (1995) (holding that due process does not invariably require "the full panoply of judicial trial procedures, such as cross-examination").

**42.** 4 AAC 27.085(i) (repealed 6/4/2004, Reg. 170) read:

All proposals with the names of the proposers and the amounts of the proposals, together with all documents submitted to the school district board for consideration in awarding the contract, must be kept on file by the district for at least three years after the close of the school year to which they relate. These records must be open to public inspection during normal business hours.

**43.** *See* 4 AAC 27.085(e) & (f) (repealed 6/4/2004, Reg. 170). The absence of any provision for an evidentiary hearing at the best-interest stage appears eminently sensible when we consider that

the regulation as a whole called for all relevant information to be submitted by bidders before the district made its final determination on a proposal's responsiveness and that subsection .085(g) defined a reconsideration right that included a formal adjudicatory process.

**44.** The record fails to support Laidlaw's contention that this arrangement deviated from the board's usual practice in awarding pupil transportation contracts. When one board member noted that the board's policy normally allows for a bid protest even before the board has made a final decision, and requested that Laidlaw's representatives be given an extended time to speak beyond "the five minutes or three minutes as typically [the board's] procedures would outline" for public comments, the district's counsel correctly pointed out that 4 AAC 27.085 specifies the procedures for awarding pupil transportation contracts. *See* 4 AAC 27.085(a) (repealed 6/4/2004, Reg. 170) ("All contracts for pupil transportation awarded by a district school board must be based on the competitive proposal process specified in this section.").

In particular, we note that 4 AAC 27.085(g) expressly identified two situations in which disappointed bidders were granted the right to receive reconsideration of a board's decision awarding a contract:

> Within five working days following the district school board's offering a contract, a proposer whose responsive proposal was not accepted may petition the board, in writing, for reconsideration of its action. Petitions for reconsideration are limited to the following grounds, which must be specified: (1) fraud or duress by the district school board or a proposer; or (2) error of the district school board in calculating dollar amounts. The aggrieved proposer shall deliver the petition to all other proposers. The district school board shall decide the scope and form the reconsideration will take, except that all responsive proposers must be given the opportunity to be heard on the petition.[45]

Though confined to petitions alleging fraud, duress, or miscalculation of dollar values, subsection .085(g) appears to have provided for reconsideration as a matter of course on these issues; moreover, the subsection expressly gave the board wide latitude to "decide the scope and form the reconsideration will take" and granted all responsive proposers a right to be heard.[46] If a petition advanced disputed factual allegations of material fraud or miscalculation, fundamental fairness might require a formal evidentiary hearing to resolve the dispute; the provisions of the regulation seem broad enough to allow appointment of a hearing officer.

Here, the central theme of Laidlaw's administrative appeal to the superior court was its allegation of fraud and collusion between First Student and the school district's staff; and secondary arguments supporting this claim essentially asserted that the board miscalculated the true value of Laidlaw's proposal. In both these respects, Laidlaw's administrative appeal fell squarely within the ambit of subsection .085(g). Thus, had Laidlaw raised these claims in a timely petition for reconsideration, the board may well have provided the more formal evidentiary process that Laidlaw now claims it was constitutionally due.

Yet the record establishes that Laidlaw consciously decided to forgo reconsideration. The deadline for Laidlaw to petition for reconsideration of the board's Monday, January 22 contract award would have been Monday, January 29. The day after the board meeting, Tuesday, January 23, Laidlaw contacted the district and requested a copy of First Student's bid proposal. The district supplied a copy to Laidlaw the following day. On Thursday, January 25, Laidlaw contacted the district and asked for copies of all supporting information submitted by First Student. On Friday, January 26, having not yet received these supplemental documents, Laidlaw's attorneys informed the district that Laidlaw was prepared to file a superior court complaint challenging the board's decision and an emergency motion for a temporary restraining order seeking to stay the award of the contract to First Student. In response, the district gave Laidlaw copies of all the requested documents on Saturday, January 27.

In a letter faxed to the district's counsel early January 29—the deadline for filing—Laidlaw's counsel confirmed that the documents had been received at noon Saturday, had been promptly shipped to Seattle for review by Laidlaw officials, and that "[a] final determination on whether or not Laidlaw wants reconsideration by the Board will be made this afternoon." By the end of the day, Laidlaw chose not to seek reconsideration, electing instead to file its superior court complaint three days later on February 1.

Laidlaw now contends that it did not have a fair opportunity to file for reconsideration. First, Laidlaw asserts that filing a petition on January 29 would have been futile because the district had already forwarded the proposed contract to the Commissioner of Education for approval on January 23. Referring to 4 AAC 27.085(h), Laidlaw argues that by sending the proposed contract on January 23, the district "made plain that it had already concluded 'any board actions on petitions for reconsideration by proposers.' "

---

**45.** 4 AAC 27.085(g) (repealed 6/4/2004, Reg. 170).

**46.** *Id.*

Laidlaw's argument bends the regulation's language. As already indicated, 4 AAC 27.085(g), required the board to accept and decide any properly framed petition for reconsideration filed within five working days of a decision awarding a contract for transportation of pupils. The regulation's next subsection, .085(h), specified that, "following any board actions on petitions for reconsideration by proposers, the district school board shall forward a copy of the proposed contract, successful proposal, and minutes containing board actions to the commissioner." The plain language of these provisions gave Laidlaw five days to file a petition for reconsideration; and nothing in these provisions suggests that the school board could have circumvented the required process for reconsideration by simply forwarding its paperwork to the commissioner prematurely. Nor does Laidlaw point to any special circumstances in the present case creating a reasonable inference that the board's early communication to the commissioner was meant to supplant or override subsection .085(g)'s provisions allowing reconsideration. To the contrary, Laidlaw's own correspondence to the district on January 29 evinces its awareness that it still had the right to petition.

Laidlaw next asserts that the district's delay in forwarding it copies of First Student's bid materials prevented Laidlaw from discovering First Student's misrepresentations before the deadline for reconsideration. The superior court found that the district's delivery of the bid materials on Saturday, January 27 allowed Laidlaw enough time to decide by January 29 whether to file for reconsideration. The superior court's finding is not clearly erroneous. As the court pointed out, 4 AAC 27.085 "merely require[d] that [the district] make the proposals public during normal business hours.... It [did] not make any mention of when the proposal must be made available to a disappointed bidder." Laidlaw has alleged neither that

the district failed to make the proposals available for inspection by the public nor that Laidlaw unsuccessfully attempted to inspect the bid materials at the district's offices. Moreover, as previously indicated, Laidlaw's attorney acknowledged receiving First Student's bid materials on January 27 and failed to express any doubt as to Laidlaw's ability to make an informed decision on reconsideration by the deadline on January 29.

Last, Laidlaw suggests that it could not have sought reconsideration because it alleged fraud by the district's staff, whereas subsection .085(g) only allowed reconsideration based on fraud by school board members and the successful proposer. But Laidlaw overlooks that its superior court complaint did allege precisely what subsection .085(g) allowed it to allege as a ground for reconsideration: fraud by First Student acting in collusion with the district's staff.

We thus conclude that Laidlaw has failed to demonstrate that its decision to forgo reconsideration was grounded on futility or inadequate notice. We further conclude that Laidlaw's conscious choice to bypass reconsideration precludes it from claiming that a trial de novo was necessary on appeal to the superior court because the board had denied Laidlaw a full hearing on the issues of fraud and proper valuation of its proposal—procedural rights that Laidlaw might have received on reconsideration.

■ Our decision on this point accords with the decision reached by the superior court. After considering the totality of the circumstances, the superior court ruled that Laidlaw's failure to seek reconsideration amounted to an unexcused failure to exhaust its administrative remedies.[47]

■ Laidlaw disputes the court's finding that exhaustion of remedies was required.[48] But insofar as Laidlaw's superior court ac-

47. The doctrine of exhaustion of remedies requires a court to decide the following: "(1) is exhaustion of remedies required; (2) did the complainant exhaust those remedies; and (3) is the failure to exhaust remedies excused?" *Eufemio v. Kodiak Island Hosp.*, 837 P.2d 95, 98–99 (Alaska 1992).

48. Laidlaw bases its contention that exhaustion was not required primarily on the United States

Supreme Court's decision in *Darby v. Cisneros*, 509 U.S. 137, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). But as First Student points out, *Darby* only governs cases to which the federal Administrative Procedure Act applies. *See id.* at 153–54, 113 S.Ct. 2539 ("Of course, the exhaustion doctrine continues to apply as a matter of judicial discretion in cases not governed by the [Administrative Procedure Act]."). We note that Laidlaw

tion raised issues within the scope of subsection .085(g)'s provision for reconsideration, we disagree. As to those points falling outside the subsection's sphere, on the other hand, we note that the superior court fully addressed and resolved Laidlaw's administrative appeal on its merits. Given these circumstances, we hold that the superior court did not abuse its discretion in converting Laidlaw's complaint to an administrative appeal and denying its request for de novo proceedings.

**B. Merits of Laidlaw's Administrative Appeal**

Laidlaw next challenges several aspects of the board's and superior court's rulings on the merits of its claims, contending that the board erred in finding First Student's proposal responsive, that the record fails to support the board's award of the contract to First Student, and that the board erred in basing its best-interests determination on factors not included in the RFP.

**1. Responsiveness of First Student's proposal**

At the time of its decision, the school board could offer the pupil transportation contract only to a responsive proposer.[49] 4 AAC 27.085(e)(2) required the district to certify a proposal as nonresponsive if: "(A) it does not materially conform to the request for proposals; or (B) it contains a material

alteration or erasure which has not been initialed by the proposer; or (C) the proposer omits or is unwilling to provide services specified in the request for proposals."[50] The district's RFP further provided that the district "shall certify a proposal as nonresponsive if," among other requirements, "[t]he proposer fails to include with its proposal a signed acknowledgment of receipt of any addendum(s) to this Request for Proposal issued by the District." Laidlaw argues that First Student's proposal was not responsive to the RFP.

■ ■ We have held that a variance from the requirements of an RFP will render a proposal nonresponsive only if that variance is material.[51] "A variance is considered material if it gives one bidder 'a substantial advantage over other bidders and thereby restricts or stifles competition.' "[52] Laidlaw cites a New Jersey Supreme Court case for the proposition that " '[t]he materiality of a particular specification is to be determined as a matter of law.' "[53] But that case is inapposite, for we have consistently recognized that we must review an agency's determination of responsiveness under the reasonable basis standard.[54] As we said in applying the reasonable basis standard in *State v. Bowers Office Products*, "the question is not the proper legal definition of the terms 'nonresponsive' or 'material,' but an application of legal concepts to facts, based on the nature of the business being conducted."[55]

does not raise any further challenge to the superior court's determination that it was required to exhaust its remedies, except by contending that 4 AAC 27.085(g) was optional because its language was permissive, providing only that a litigant "may" petition for reconsideration. But it seems obvious that the permissive phrasing was simply designed to allow litigants the right to waive their procedural right: Laidlaw cites no statute, regulation, or rule providing that a litigant *must* file an appeal.

**49.** *See* 4 AAC 27.085(f)(1) (repealed 6/4/2004, Reg. 170) ("[T]he district school board shall offer the contract only to a proposer whose proposal has been certified as responsive under 4 AAC 27.085(e).").

**50.** Further, the district could have certified a proposal as nonresponsive if "(A) the proposer failed to render substantial performance of a pupil transportation contract with any school district in the state within the previous three years; or (B) the district cannot assure itself that

the proposer will provide the specified service." 4 AAC 27.085(e)(3) (repealed 6/4/2004, Reg. 170).

**51.** *See King v. Alaska State Hous. Auth.* ("*King I*"), 512 P.2d 887, 892 (Alaska 1973); *see also Gunderson v. Univ. of Alaska, Fairbanks*, 922 P.2d 229, 235 (Alaska 1996); *cf.* 4 AAC 27.085(e)(2)(A).

**52.** *McBirney & Assocs. v. State*, 753 P.2d 1132, 1136 (Alaska 1988) (quoting *Chris Berg, Inc. v. State, Dep't of Transp. & Pub. Facilities*, 680 P.2d 93, 94 (Alaska 1984)).

**53.** *George Harms Constr. Co., Inc. v. Borough of Lincoln Park*, 161 N.J.Super. 367, 391 A.2d 960, 965 (1978).

**54.** *See Gunderson*, 922 P.2d at 233; *State, Dep't of Admin. v. Bowers Office Prods.*, 621 P.2d 11, 13 (Alaska 1980); *Kelly v. Zamarello*, 486 P.2d 906, 917 (Alaska 1971).

**55.** 621 P.2d at 13 n. 4.

Laidlaw initially claims that First Student's proposal was automatically nonresponsive because First Student failed to acknowledge an addendum to the RFP. Shortly before the proposal deadline, Laidlaw asked the district to clarify whether the cost of mid-day transportation for kindergarten and gifted students should be treated the same or differently in the proposal. The district responded by issuing Addendum 5 to the RFP, which stated:

> The District has divided mid day work into two categories, routes that will be paid based on an hourly rate and routes that are included in the daily rate. Mid day kindergarten routes and routes serving the Martin Luther King Career Center will be paid on an hourly rate. All other mid day routes are to be included in the daily rate.

Laidlaw was the only one of the five proposers who returned a signed acknowledgment of receipt of Addendum 5.

■ Laidlaw argues that First Student's proposal was nonresponsive for failure to acknowledge Addendum 5. In order to determine whether First Student's failure to acknowledge Addendum 5 was a material omission rendering the proposal nonresponsive, the proper inquiry is whether the omission gave First Student a "substantial advantage" over the other proposers.[56]

The record here shows that the district had a reasonable basis for concluding that First Student's failure to return Addendum 5 did not give it a substantial advantage over the other proposers. As the district and First Student point out, Addendum 5 restates language that was already in the RFP. An underlined paragraph in the RFP independently provided, in relevant part:

> Mid day kindergarten routes and routes serving the M.L. King Career Center are not eligible for reimbursement from the Alaska Department of Education and Early Development. These routes cannot be included in the daily bus rate. The contractor shall be reimbursed for these routes on an hourly basis.

The record indicates that no proposer other than Laidlaw expressed uncertainty about

this requirement before the district issued Addendum 5, and only Laidlaw returned an acknowledgment of the addendum. First Student's proposal properly included hourly rates for mid-day kindergarten and Career Center routes in its proposal; it thus derived no substantial advantage over Laidlaw through its failure to acknowledge Addendum 5.

■ Laidlaw relies on the RFP's language providing that the district "shall certify" a proposal as nonresponsive if it does not acknowledge an addendum. But this language cannot reasonably be construed as precluding the district from applying the conventional standard of materiality to relax an unduly harsh application of the acknowledgment requirement. Under the circumstances presented here, rigid enforcement of this requirement would have elevated form over substance, frustrating the district's and the regulation's clear intent to create a competitive bidding process for pupil transportation. In *Kelly v. Zamarello*, where an agency found a bid nonresponsive, we said: "A decision rejecting a bid for nonresponsiveness has application beyond the instant case, going to the integrity of the entire competitive bidding process."[57] Here, strict enforcement of the RFP's requirement to acknowledge each addendum would have undermined the competitive bidding process by placing the district in the position it sought to avoid, that of having no opportunity to compare multiple responsive bids.

■ Laidlaw next claims that First Student's proposal was nonresponsive because it failed to include the signature of an authorized corporate officer. The RFP required that all proposals be signed by an individual authorized to bind the corporation. Further, all proposals were required to include a certified corporate resolution stating the names of the individuals authorized to bind the corporation. First Student's corporate resolution stated that E. Bruce Lyskawa, Carey Paster, and Steve Hebborn were authorized the bind the corporation. Although none of these individuals personally signed First Student's

---

**56.** *See Lower Kuskokwim Sch. Dist. v. Found. Svcs., Inc.,* 909 P.2d 1383, 1386–87 (Alaska 1996).

**57.** 486 P.2d at 917.

proposal, Lyskawa gave approval for his name to be signed by John BeGasse, First Student's Business Development Manager, who inserted his own initials, "J.B.," after Lyskawa's name.

Laidlaw asserts that because none of the individuals authorized to bind First Student actually signed the proposal, it was nonresponsive to the RFP. The superior court disagreed, accepting First Student's argument that Lyskawa had authorized BeGasse to sign Lyskawa's name, which in turn bound First Student to the terms of its proposal. The court's finding was supported by BeGasse's affidavit, verifying that Lyskawa had authorized him to sign Lyskawa's name because there was insufficient time for BeGasse to forward the proposal to Lyskawa for his personal signature before the deadline. Moreover, Lyskawa ratified BeGasse's action by testifying on behalf of First Student at the board meeting.

■■■ In *Bruton v. Automatic Welding & Supply Corporation*, we observed that an agent's

> authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.[58]

Laidlaw cites no convincing authority establishing that BeGasse lacked sufficient authority to bind First Student by signing Lyskawa's name with his express approval. Under these circumstances, we conclude that the district had a rational basis for concluding that First Student's proposal was responsive despite the fact that BeGasse signed the proposal on Lyskawa's behalf.

■■■ Laidlaw claims that First Student's proposal was nonresponsive to the RFP for several additional reasons. Specifically, Laidlaw alleges that First Student failed to certify that it was able to supply adequate facilities for Anchorage operations, that it did

not submit the names and resumes of its Anchorage management team, that it did not supply sample driver route notebooks, and that it failed to submit a benefit scale for drivers and attendants. Laidlaw's reply brief also accuses First Student of failing to provide adequate financial data. According to Laidlaw, the RFP required First Student to supply all this information.

The district and First Student acknowledge that some of this information was omitted from First Student's proposal, but they insist that none of the omissions were material. The district and First Student further argue that the RFP's requirements pertaining to some of the alleged omissions were more flexible than Laidlaw admits. To illustrate this point, the district and First Student note that under the strict standard Laidlaw now seeks to apply, its own proposal would have contained omissions making it nonresponsive. Regarding other alleged omissions, First Student contends that Laidlaw's strict test would have made it nearly impossible for any proposer other than the incumbent to provide proof of existing facilities or driver route manuals for Anchorage.

We find Laidlaw's arguments to be unpersuasive. In our view, the district had a reasonable basis for concluding that First Student's information about facilities materially complied with the RFP. The RFP required only that the proposer supply "a letter of intent from a recognized third party certifying that arrangements have been made for the purchase, lease or rent of necessary vehicles and/or facilities and that necessary financing is available, and that such vehicles and/or facilities will be available in time to provide the services required by the contract." First Student supplied a letter from Bond, Stephens & Johnson, a commercial real estate service, certifying that First Student had identified locations in Anchorage and Eagle River in which to locate facilities. Although the letter did not discuss financing, the district could reasonably have concluded

**58.** 513 P.2d 1122, 1125 (Alaska 1973) (quoting RESTATEMENT (SECOND) OF AGENCY § 26 (1958)); *see also Sea Lion Corp. v. Air Logistics of Alaska, Inc.,* 787 P.2d 109, 117–19 (Alaska 1990) (quoting *Bruton,* 513 P.2d at 1127) (finding doctrine of ratification by silence to be applicable when two characteristics are met: (1) the act to be ratified "must be done by someone who held himself out to the third party as an agent for the principal," as BeGasse did by signing Lyskawa's name; and (2) "the principal must then have failed to act in response under circumstances which 'according to the ordinary experience and habits of men, one would naturally be expected to speak if he did not consent . . . .' ").

that First Student's proposal was sufficiently responsive as to facilities.[59]

 First Student also provided a sample driver handbook. It did not prepare a handbook specific to Anchorage, but provided its national handbook. First Student explained in its proposal that it would develop specific policies for Anchorage if it were awarded the contract. Again, the district could reasonably have concluded that First Student's proposal was sufficiently responsive to the RFP's request for driver handbooks.

 First Student's proposal further stated that it would provide a three-percent increase over the then-existing pay scale. First Student went on to explain that it could not be more specific about wages because of ongoing salary negotiations and pending changes to Alaska's minimum wage laws. Under the circumstances, the district could reasonably have concluded that First Student's information about benefits was sufficiently responsive to the RFP.

 First Student provided financial data for its parent company, First Group, but not separate data for First Student, Inc. Laidlaw cites *Matter of Alpha Q, Inc.*, a Comptroller General opinion holding that "parent company data is informational and has no bearing on the bid's responsiveness." [60] But Laidlaw quotes *Alpha Q* out of context. There, the unsuccessful bidder was challenging the Army procurement officer's finding of responsiveness as to a successful bid that included the bidding company's financial data, but omitted its parent company's data.[61] Reviewing the Army's decision under the reasonable basis standard, the Comptroller General found that omitting the parent's information did not render the proposal nonresponsive.[62] *Alpha Q* neither explicitly nor implicitly addresses the converse situation at issue here, where the district relied on the financial status of First Student's corporate parent as a sufficient basis to find that First Student was financially sound. Here, reviewing the district's decision under the same deferential standard applied in *Alpha Q*, there was unquestionably a reasonable basis for the finding of financial health.

In summary, the district could properly find that First Student's proposal was responsive to the RFP.

### 2. Best-interest finding

 Because Laidlaw was the low proposer and First Student offered to match Laidlaw's bid, the board was permitted to award the contract to First Student only if it found that doing so would be "in the best interest of the district." [63] Laidlaw claims that the board's best-interest finding was not supported by the record, was not based on the evaluation factors set out in the RFP, was impermissibly based on factors not in the RFP, and was the product of misrepresentation and favoritism. The parties agree that we review the district's best-interest finding only to determine whether it has a reasonable basis in the record.[64] But Laidlaw's claim that the board was required to base its best-interest finding on factors set out in the RFP presents a question of law that we review de novo.[65]

4 AAC 27.085 did not specify what factors the board should consider in making its best-interest finding.[66] But the board's discretion is generally constrained by our cases recognizing that an agency has a basic duty to consider all bids honestly and fairly.[67] Laidlaw claims that Alaska case law also requires

---

59. *Cf. H.V. Collins Co. v. Tarro*, 696 A.2d 298, 305 (R.I.1997) (finding bid responsive despite omission of some documents "[g]iven the overall comprehensiveness of [the successful proposer's] bid and the absence of any evidence that the school committee acted in a corrupt manner or in bad faith").

60. Citing *Matter of Alpha Q, Inc.*, 1989 WL 241317 *2 (Comp.Gen.1989).

61. *Id.*

62. *Id.*

63. 4 AAC 27.085(f)(1)(B) (repealed 6/4/2004, Reg. 170).

64. *See King*, 633 P.2d at 263.

65. *See State, Dep't of Educ. v. Nickerson*, 711 P.2d 1165, 1169 (Alaska 1985).

66. *See* 4 AAC 27.085(f)(1) (repealed 6/4/2004, Reg. 170).

67. *See King*, 633 P.2d at 261.

an agency to consider only those factors set out in the RFP; because the RFP in the present case did not list past performance as a qualifying factor, Laidlaw reasons that the board had no authority to consider it in finding that the district's best interest would be served by awarding the contract to First Student.

But the cases Laidlaw cites do not support such a blanket rule. Laidlaw cites *Aloha Lumber*[68] for the proposition that "past experience with the contracting agency under different contracts ... is irrelevant" if it is not identified by the RFP as a factor for evaluation. Laidlaw misconstrues our ruling in *Aloha Lumber,* which addressed a question of responsiveness, not one of best interests. Aloha Lumber claimed that its proposal should have been found responsive despite being incomplete because the RFP's requirements did not take into account Aloha Lumber's experience in other bidding processes.[69] We found that "Aloha's experience in a prior RFP involving a different timber sale is irrelevant to determining responsiveness under this timber sale RFP."[70] It is not clear why Laidlaw would read this language regarding responsiveness to support its contention that the district was not permitted to consider past performance in deciding which responsive proposal would serve the district's best interest.

Laidlaw's reliance on *State, Department of Education v. Nickerson* is also misplaced, because the disappointed proposer there "claimed violation of a statute requiring the state to follow the evaluation criteria published in its RFP."[71] Here, although 4 AAC 27.085 expressly provided that the RFP must contain "the criteria the district school board will apply in determining *certification* of pro-

posals"[72] the regulation used the words "certification" and "certify" exclusively in reference to the responsiveness determination, not the best-interest determination.[73] By contrast, in explaining the process for choosing among responsive proposers, the regulation made no reference to the RFP. Under 4 AAC 27.085(f), the only factors the board was required to consider were price and the best interest of the district:

> [T]he district ... shall offer the contract either (A) to the proposer whose responsive proposal contains the lowest dollar amount; or (B) to a proposer whose responsive proposal is within five percent of the responsive proposal with the lowest dollar amount *if the proposer agrees to match the responsive proposal with the lowest dollar amount* and the board determines that the offer to other than the low proposer *is in the best interest of the district.*[74]

Laidlaw has not alleged that the district impermissibly considered factors not mentioned in the RFP when certifying proposals as responsive. And we find no support for Laidlaw's contention that the board could only consider the same factors when making its best-interest determination. Indeed, the fundamental difference between a proposal's responsiveness, a technical matter, and its ability to serve the district's best interest, a policy matter, suggests the need for a different evaluative framework. While the factors listed for determining responsiveness were undoubtedly germane to the district's best interest, we conclude that those factors did not preclude the board from considering any other factors it deemed appropriate to ensure that all responsive proposals obtained fair and honest consideration.[75]

**68.** 994 P.2d 991 (Alaska 1999).

**69.** *See id.* at 997.

**70.** *Id.*

**71.** 711 P.2d at 1169.

**72.** 4 AAC 27.085(a)(2) (repealed 6/4/2004, Reg. 170) (emphasis added).

**73.** 4 AAC 27.085(e)(1) (repealed 6/4/2004, Reg. 170) ("Proposals must be reviewed by the district for conformity with the request for proposals, including proposal specifications, terms of deliv-

ery of transportation services, and other conditions imposed by the request for proposals. Following that review, the district shall certify each proposal as either responsive or nonresponsive.").

**74.** 4 AAC 27.085(f)(1) (repealed 6/4/2004, Reg. 170) (emphasis added).

**75.** *Fairbanks N. Star Borough Sch. Dist. v. Bowers Office Prods., Inc.,* 851 P.2d 56, 58 (Alaska 1992) (holding that "a government agency which solicits bids for goods or services has an implied contractual duty to fairly and honestly consider bids").

■ Laidlaw next alleges that the district's bid process "was tainted by misrepresentation and favoritism." We "require[ ] a disappointed bidder to meet a high standard of proof in order to recover for breach of an agency's implied promise to consider bids honestly and fairly." [76] Laidlaw fires a barrage of unsubstantiated assertions accusing the district's staff of falsely criticizing Laidlaw's past performance. With the exception of the driver wage scale, Laidlaw has failed to identify anything in the record suggesting that the district's statements concerning Laidlaw were inaccurate. And even assuming that the disputed statements by district staff were incorrect, Laidlaw fails to advance any support for its contention that the inaccuracies reflected collusion between the district and First Student or intentional falsehood by either party.

The cases Laidlaw cites to support its claims of collusion and fraud involved proven instances of covert negotiations between an agency and a favored proposer. [77] Courts understandably condemn private negotiations of this kind because they create the appearance of impropriety and seriously undermine the competitive bidding process. But here Laidlaw fails even to allege any specific instance of covert negotiations or collusion between the district and First Student. Similarly, we find no specific description or offer of evidence in the record supporting Laidlaw's conclusory and self-serving claim that the district "never had any intent to award a contract to any proposer other than First Student, regardless of which proposer was the lowest price responsive and responsible proposer." These claims therefore appear wholly meritless.

■ In any event, as previously mentioned, because Laidlaw passed up the opportunity to raise these claims on reconsideration, thereby allowing First Student's contract to attain final approval, the only remedy available to Laidlaw at this late juncture if it managed to prove fraud and collusion would be bid preparation costs. [78]

■ Laidlaw further asserts that the board's best-interest finding lacks any rational basis. After the board voted to award the contract to First Student, the board president said:

> [T]he Board has found [by] 6 to 0 vote that giving the contract to First Student was in the best interest of the District in the areas that new equipment will be provided, larger capacity buses and a better working relationship with employees and facilities [will be] provided to them.

Laidlaw challenges these reasons as unsupported in the record.

But the board heard positive and negative testimony concerning both Laidlaw and First Student. On the issue of management relations with employees, Laidlaw informed the board that First Student's drivers had been involved in a two-week strike in Providence, Rhode Island, over health benefits; yet First Student's Vice President for Human Resources addressed this issue in his oral presentation, apparently to the board's satisfaction. District staff further reported that the Seattle, Washington and Charleston, South Carolina school districts were very pleased with First Student and its treatment of employees, although Minneapolis reported some problems. As to Laidlaw's relations, the board heard testimony from district staff that drivers who had worked both for Laidlaw and for the district were less satisfied with Laidlaw. District staff also reported that Laidlaw's employees were upset when Laidlaw located a facility for drivers in a former fish processing plant that still smelled of fish. Of the two Laidlaw drivers who spoke at the meeting, one supported the Laidlaw proposal, and the other simply asked the district to choose a company that would treat the drivers with "dignity and respect." Given the totality of this evidence, the board had a rational basis for finding that First Student would have a "better working relationship" with employees than Laidlaw.

**76.** *Id.* at 59 (citing *King,* 633 P.2d at 263).

**77.** *See Paul Wholesale, B.V./HOLS Trading, GmbH, J.V. v. State, Dep't of Transp. & Pub. Facilities,* 908 P.2d 994, 1000 (Alaska 1995); *Dick Fischer Dev. No. 2, Inc. v. Dep't of Admin.,* 838 P.2d 263, 267 (Alaska 1992); *McBirney & Assocs.,* 753 P.2d at 1138.

**78.** *See Dick Fischer Dev. No. 2, Inc.,* 838 P.2d at 266; *King,* 633 P.2d at 263.

With regard to facilities, district staff raised criticisms of Laidlaw's past provision of various facilities. They were particularly critical of a facility that formerly housed a fish processing plant, a facility that lacked electrical outlets for the buses to plug into during the winter, and a facility that generated complaints about diesel fumes because it was too near a residential area. The staff also expressed displeasure about a terminal in South Anchorage that was not ready in time for the school year. By contrast, First Student told the board that it had a short list of sites and would select them in consultation with the district. Given this evidence, we think that the board's preference for First Student was rationally based.

Laidlaw also challenges the board's determination that the new, higher capacity buses proposed by First Student were in its best interest. But the board received a vast amount of competing evidence and testimony about passenger buses. First Student proposed to offer all new buses, while the average age of Laidlaw's buses would be 3.56 years. First Student also offered to provide buses that would seat 84 students rather than 72. A Laidlaw representative told the board that 84–passenger buses would be difficult to handle on some routes. Two members of the board raised concerns about 84–passenger buses, but the district responded by indicating that higher capacity buses would allow for growth without hiring more drivers and were likely to decrease discipline problems. Laidlaw now asserts that its proposal provided for larger special education buses than First Student's proposal. Yet even if true, this assertion would not have undercut the existence of a rational basis for the board's finding that the buses proposed by First Student for regular routes were in the district's best interest.

In summary, we have "previously deferred to an agency's or district's oversight in analogous contexts." [79] In light of the broad discretion afforded to the district by 4 AAC 27.085(f)(1), and the existence of substantial record evidence supporting the board's statement explaining its finding, we conclude that the district had a reasonable basis to find that awarding the pupil transportation contract to First Student was in the district's best interest.

## C. Attorney's Fees

■■■ The district and First Student requested twenty percent of their actual attorney's fees incurred before conversion of the civil case to an administrative appeal, and forty percent of their actual fees incurred after conversion. The superior court awarded nothing for fees incurred before conversion but awarded each appellee twenty percent of their fees incurred after conversion. The award totaled $5,537.20 for the district and $9,966.20 for First Student.

Laidlaw challenges these awards as excessive and unsupported. It claims that the work was duplicative and wasteful, and that the appellees claimed an unreasonable number of hours. It further claims that First Student's billing statements are too heavily redacted to substantiate its claimed fees.

■■■ We review a trial court's award of attorney's fees for abuse of discretion [80] and will not overturn the award unless it is "manifestly unreasonable." [81] Alaska Appellate Rule 508 "is the appropriate authority for an award of fees in an appeal from an administrative decision." [82] The rule gives the appellate court broad discretion to allow attorney's fees "in an amount to be determined by the court." [83] In *Rosen v. State Board of Public Accountancy,* we offered this guidance to superior courts sitting as intermediate courts of appeal:

> The extent to which litigants have been involved in prior administrative proceedings, and the cost thereof, as well as the nature of judicial review and its cost, are factors which a trial court may wish to

**79.** *Lower Kuskokwim Sch. Dist.,* 909 P.2d at 1389 (citing *Fairbanks N. Star Borough Sch. Dist.,* 851 P.2d at 59–60); *see also State v. Northern Bus Co., Inc.,* 693 P.2d 319, 322 (Alaska 1984).

**80.** *See United Servs. Auto. Ass'n v. Pruitt ex rel. Pruitt,* 38 P.3d 528, 531 (Alaska 2001).

**81.** *See D.H. Blattner & Sons, Inc. v. N.M. Rothschild & Sons, Ltd.,* 55 P.3d 37, 56 (Alaska 2002).

**82.** *Rosen v. State Bd. of Pub. Accountancy,* 689 P.2d 478, 480 n. 3 (Alaska 1984).

**83.** Appellate Rule 508(e).

consider in determining the application of Appellate Rule 508(e). Likewise, the importance to the litigants of rights asserted is a factor to be considered.[84]

Although the superior court did not explain its attorney's fees award,[85] the court awarded substantially less than the district and First Student requested, suggesting that it considered the *Rosen* factors or made an equivalent analysis. Moreover, the court could properly have relied on uncontradicted affidavits from counsel for the district and First Student averring that "[a]ll attorney fees incurred by [the appellees] were reasonable and necessary." Finally, we think that, barring any particularized reason to question specific entries, First Student's redacted billing statements were sufficiently clear to support its request.[86] Our review of the record reveals no abuse of discretion.

## IV. CONCLUSION

The superior court properly converted Laidlaw's civil action to an administrative appeal and was not required to grant Laidlaw's request for a trial de novo to resolve the appeal; the Anchorage School Board had a reasonable basis for finding that First Student's proposal was responsive and that the school district's best interest would be served by awarding the pupil transportation contract to First Student; and the superior court did not abuse its discretion in awarding attorney's fees to the district and First Student. Accordingly, we AFFIRM the superior court's judgment.

FABE, Justice, not participating.

---

84. *Rosen,* 689 P.2d at 482–83.

85. Superior courts presiding over an administrative appeal need not justify a decision to award attorney's fees. *See id.* at 480.

86. *Cf. Gonzales v. Safeway Stores, Inc.,* 882 P.2d 389, 399 (Alaska 1994) (holding that redacted billings are sufficient documentation of services performed under *Hayes v. Xerox Corp.,* 718 P.2d 929, 939 (Alaska 1986)).